**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 24 2016

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**LINDA IVES**                                        **PLAINTIFF**

**V.**                        CASE NO. *4:16cv608-JLH*

**UNITED STATES OF AMERICA, acting by and**         **DEFENDANTS**
**through its agencies:**
**CENTRAL INTELLIGENCE AGENCY,**
**DEFENSE INTELLIGENCE AGENCY,**
**DEPARTMENT OF JUSTICE,**
**DEPARTMENT OF HOMELAND SECURITY,**
**DRUG ENFORCEMENT ADMINISTRATION,**
**FEDERAL BUREAU OF INVESTIGATION,**
**UNITED STATES ATTORNEY'S OFFICE,**
**UNITED STATES DEPARTMENT OF STATE, and**
**STATE OF ARKANSAS, acting by and through its**
**agencies: ARKANSAS STATE POLICE,**     This case assigned to District Judge _____
**BRYANT POLICE DEPARTMENT,**            and to Magistrate Judge _____
**SALINE COUNTY SHERIFF'S OFFICE**

## COMPLAINT FOR FREEDOM OF INFORMATION

Comes now plaintiff, Linda Ives, by and through counsel, R. David Lewis, and for her cause of action against the defendants alleges and states:

1.      The refusals to comply with the Freedom of Information Act occurred in this district.  This court has jurisdiction and venue under 5 USC § 552(a) (4) (B).

2.      The defendants listed from Central Intelligence Agency down to but not including the State of Arkansas are federal agencies doing business in this federal court district. The remainder of the defendants are state and local agencies doing business in this federal court district.

3.      Plaintiff is a resident of Saline County, Arkansas and is the mother of Larry Kevin Ives who died August 23, 1987. His body was found on a train track

in Saline County along with Don Henry's although they may have died elsewhere. Plaintiff has been trying for the last 29 years to learn how her son was killed, why and by whom and has been met with stonewalling at every turn. Plaintiff is trying by this action to learn how her son was killed, by whom, and how and why, how and by whom his cause of death was covered up. This death has been the subject of national and international television programs such as Unsolved Mysteries and several books.

4.      Defendant agencies have conducted investigations into the death of plaintiff's son. Plaintiff has filed Freedom of Information requests with the defendant agencies and has received inadequate responses by virtue of no response or highly redacted responses. The FOI requests and the responses from the agencies are attached hereto as **Exhibits 1-80.** There is no legal excuse for non-response or a redacted response as there is no ongoing investigation as no one is being investigated or arrested.  It is not an undisclosed investigation as it has been the subject of several books, movies and television specials.  Plaintiff is entitled to know who killed her son, why her son was killed and who covered it up.  Plaintiff is entitled under the laws of the United States, 5 USC § 552(a) (4) (B), and Arkansas, A.C.A. § 125-19-105 (a), to full and unredacted reports from the defendants' investigations into the death of Kevin Ives. Plaintiff believes the only reason she has not received adequate responses is that an adequate response would show crimes by government officials and would expose them and government agencies to suits for damages.  Plaintiff will prove that there has been a massive cover-up by federal, state and county officials.

5.    Plaintiff is entitled to attorney's fees per A.C.A. § 25-19-105 (b) (6) and 5 U.S.C. § 552.

6.    There are lots of accounts of the cause of  death of Kevin Ives from lots of books and other sources, but the accounts support several inconsistent theories of who did what which will be difficult to reconcile without the investigative reports from the defendants. These books also suggest why and by whom these reports are being suppressed.

### THE BOYS ON THE TRACKS

**The majority of the following paragraphs, 7-25, are from *THE BOYS ON THE TRACKS***

7.    For instance, Mara Leveritt in her 1999 book *The Boys on the Tracks,* Bird Call Press, Little Rock, reported that the medical examiner, Fahmy Malak, originally reported that the deaths were accidental from being run over by a train due to THC intoxication.  In May 1988, Dr. Burton(then Chief Medical Examiner for Dekalb County and Senior Consulting Pathologist for Cobb, Gwinnett and Paulding Counties in the State of Georgia), conducted a new round of autopsies on Don and Kevin and concluded that their deaths were definitely homicides. Leveritt then reported that the state police investigation file reported that the area where the two boys' bodies were found was a drop zone for drugs coming out of Texas by airplane or train. Linda Ives was allowed to read the State Police file and it revealed that State police investigator, Don Birdsong, wrote a report that said Don Henry and Kevin Ives overheard a telephone conversation between a cocaine dealer, an unidentified individual, about a large drug drop near the area of the

tracks and Don Henry and Kevin Ives decided to rip off the drugs, but were caught and killed. Another report was that on the night the boys were killed, a witness saw two police officers beat up two boys and throw them in the back of a police car a short distance from where the bodies were found. A federal investigation was begun, but the Assistant United States Attorney, Bob Govar, reported that the FBI and DEA did not seem very interested and did not furnish much help. Other reports in the state police file revealed, according to plaintiff who was allowed to read it at one point, that residents had complained about frequent low-flying planes in the area around the tracks. Leveritt also reported that Sharline Wilson wrote a statement that she was present with Dan Harmon, then prosecuting attorney for Saline County, Arkansas, later convicted of federal drug crimes, and Keith McKaskle, owner of a local bar and later found murdered, at the time and place the boys were killed because they were there to rip off the drop. Within the last couple of years, Linda Ives took Sharline Wilson's statement to Saline County Prosecuting Attorney Ken Casady and he refused to read it and referred her to the Saline County Sheriff, Rodney Wright, a relative of Dan Harmon, who said that he could not interview Sharline Wilson without a warrant from the Saline County Prosecuting Attorney.

8.      Leveritt then discusses the history of Barry Seal and his drug smuggling into the Mena, Arkansas airport. Internal Revenue Service agent Bill Duncan was asked by United States Attorney Asa Hutchinson to look for evidence of money laundering, which Duncan found. Duncan reported that Seal had a Learjet,

helicopters, military cargo planes, several smaller planes, and two ships with navigational equipment, one of which had a helipad.

9.      Seal said in a federal drug trial in Las Vegas, Nevada in 1985 that he flew 10 flights a year for 10 years carrying from 600-1200 pounds of cocaine each trip, the cocaine being worth $20,000-$50,000 a pound. President Reagan authorized the CIA to undertake a program of support for the Contras in Nicaragua, but the Boland Amendment prohibited the CIA from assisting the Contras.  The Boland Amendment was an amendment to legislation in 1984 to limit covert activity in Central America and specifically barred the CIA and the DIA from assisting the Contra rebels.   However, apparently some within our government thought spending money in Arkansas to train pilots to go to Nicaragua or taking guns to Nicaragua was not a violation. State police investigator Russell Welch supplied then United States Attorney Asa Hutchinson with a list of 20 witnesses that included Barry Seal and officers of Rich Mountain Aviation in Mena, but Hutchinson only subpoenaed two of the 20 witnesses to the grand jury and they complained that Hutchinson asked nothing about the crime.

10.      Hutchinson was succeeded as United States Attorney by Michael Fitzhugh. Duncan made several trips to Fort Smith to talk to Fitzhugh but said the trips were to no avail.   Duncan later testified that the Mena Airport money laundering was covered up by the United States Attorney. He had not been called to testify before the federal grand jury on Mena. Also, the FBI kept a file on the Mena Airport for years.

11.    In October 1986, the C-123 that had been Seal's personal aircraft went down in Nicaragua, whether being shot down or the result of a bomb aboard is unknown. A member of the crew who survived, Eugene Hasenfus, reported that he was working for the CIA and was working for Max Gomez, his overseer, whose real name was Felix Rodriguez. The plane was owned by a company called Corporate Air Services, whose proprietor was retired Air Force Major General (and former Deputy Assistant Secretary of Defense) Richard Secord, former Deputy Assistant Secretary of Defense.

12.    Larry Nichols, working for Arkansas Development Finance Authority, filed a request in 1988 for the governor's office to issue Arkansas Travelers certificates for the Calero brothers from Miami and Major General John K. Singlaub of Phoenix. One of the Calero brothers was the leader of the largest group of Contras and Singlaub was one of the Contra's most prominent supporters. The prosecutor in Mena, Charles Black, said that he believed that federal law enforcement agencies from the Justice Department to the FBI to the DEA received encouragement to downplay any investigation that might expose Seal's activities and the National Security Council's involvement in them. He believed that the activities of Mr. Seal were so valuable to the Reagan White House that no information concerning Seal's activities could be released to the public. Plaintiff began to believe that the pilots seen flying over the tracks in Alexander were dropping bundles of cocaine or money and had been part of Seal's organization.

13.    Duncan was subpoenaed in 1989 to testify before the House Judiciary Subcommittee on Crime. Duncan intended to tell them that a confidential informant told Russell Welch that the United States Attorney General Meese had received a bribe of several hundred thousand dollars from Barry Seal directly, but when he got to Washington, Duncan was told by IRS lawyers to tell the subcommittee that he had no information about that. But he testified to that anyway and then resigned.

14.    In 1990 HBO filmed *Double-crossed*, a movie based on Seal's life in which Seal was played by Dennis Hopper, which demonstrates that this subject is already public knowledge and the public has an interest in it.

15.    Later after he was no longer working for IRS, Duncan testified before the House Government Operations Subcommittee that evidence showed drug smuggling, gun running, money laundering and covert operations by Seal and employees and contract operatives of the United States intelligence services whereby profits were used to fund covert operations.

16.    United States Representative Bill Alexander, representing the 1st District of Arkansas, and Arkansas Secretary of State Winston Bryant flew to Washington to deliver evidence to Lawrence Walsh, the special prosecutor for the Iran-Contra investigation, and told Walsh there was absolutely an Iran-Contra connection with Mena, Arkansas. Later the congressman said the Feds dropped the ball and covered it up.

17.    When asked about it in 1991, Governor Clinton said he had authorized financial help for a grand jury investigation. He said his office dropped off the

entire investigative file to a congressional committee. Charles Black, the Polk County prosecutor, publicly disputed the governor's recollection regarding an offer of financial help. Black said he asked for financial help, but the governor's office never followed up on the offer.

18.     John Brown, an investigator for the Saline County Sheriff's office, reported to plaintiff, Sheriff Pridgen and ex-prosecutor Jean Duffey that he talked to a pilot in Texas who admitted being a drug pilot and remembered that he had flown drugs to points near the Saline-Pulaski county lines, precisely where the boys' bodies were found. Duffey concluded the cover-up was because the drugs were Mena drugs. Duffey said she spoke to that informant who told her word in the organization was that someone had stolen the drop and two kids had been killed.

19.     In September 1995, agent William Temple of the FBI office in Little Rock told Linda Ives and her husband that it might be time for her to consider that a crime was not committed although the FBI had been working for two years on the case through its agent, Phyllis Cornan.

20.     In March 1996, the documentary, *Obstruction of Justice,* was released about the investigation into the murders and Dan Harmon's activities. John Brown, a former Saline county detective on the video, made the link between drug corruption in Saline County and drug corruption at Mena which began when Russell Welch, the Arkansas State police investigator in Mena, gave him a statement made by a confidential informant in federal prison which said the boys were killed because of the drug activity they had discovered and it was connected

to the drug enterprise headquartered at Mena. The video explained what was known about Barry Seal and his use of airplanes to distribute cocaine. Brown told of reports he had found in the Saline County Sheriff's office dating back to 1987 and 1988 of residents living there where the boys' bodies were found complaining of planes flying over the tracks at 100 feet above ground level with their lights out.

21.     In *Boys on the Tracks*, Leveritt then discussed how Linda Ives was filmed by two people who produced a documentary called *The Clinton Chronicles* which discussed that the Mena airport had been the command post of the biggest drug-smuggling operation in the United States importing $100 million per month in cocaine into Mena.  It alleged that much of that money had been laundered through the ADFA, a bonding agency that Governor Clinton had created to help small businesses get started.  The video and Leveritt's book discussed that Governor Clinton's half-brother, Roger Clinton, and his bond dealer friend Dan Lasater had gone to prison for cocaine.  Richard Garrett had stated on *Unsolved Mysteries*, a television program which taped informational segments regarding the boys' deaths beginning in 1988, that Saline County and Central Arkansas were overrun with drug-trafficking at a high level that extended to other states and other counties.  Leveritt then discussed the history of Barry Seal, who moved his smuggling operation from Louisiana to Mena, Arkansas in 1982.

22.     Leveritt also reported that staff writer Gary Webb for the San Jose Mercury News published a series of articles detailing that (at the time Seal was operating) a San Francisco Bay area drug ring sold tons of cocaine to Los Angeles

street gangs and funneled profits to Contra groups affiliated with the CIA. According to Webb, the CIA had thwarted repeated attempts to prosecute the ring's kingpin possibly to cover-up ties between traffickers and Contra leaders. Gary Webb published his findings in *Dark Alliance, the CIA, the Contras and the Crack Cocaine Explosion*, Seven Stories Press, New York, 1999.

23.     Leveritt also reported that Jack Blum, an investigator for John Kerry's subcommittee probing CIA connections to Contra drug-smugglers, said that "The Justice Department flipped out to prevent us from getting access to people, records-anything that would help us find out about it." Blum also says the FBI denied the very existence of records relating to Mena. Blum said he uncovered a procedure which was particularly troubling because people would call the customs office in Miami and say, "Stand down, flights are going out, flights are coming in", and then the customs inspections would be stopped. Blum also said that officials at the Justice Department told US Attorneys "not to talk to us or give us paper." In November 1996, a CIA inspector general's report was declassified which admitted that the CIA had been at Mena for routine aviation related services, that L.D. Brown, an Arkansas State policeman assigned to security at the Arkansas' governor mansion, had been a candidate for CIA employment in 1994 at the suggestion of Bill Clinton and the CIA had limited contact with Seal and installed cameras on his plane. L.D. Brown is further discussed in paragraph 26.

24.     In November 1996, Linda Ives got a call from Philip Weiss who told her he had been asked to prepare an article in the New York Times Magazine about people who hated Clinton. Weiss explained that Mark Fabiani, a White House

lawyer, provided him with a set of news clippings about people who oppose the president and among those was a story about the "boys on the tracks." Linda Ives called Micah Morrison, an editorial page writer for the Wall Street Journal, who had written an article about her earlier in the year, inquiring about Phillip Weiss and telling Morrison that Weiss talked about a packet of press clippings Weiss said that Mark Fabiani, White House counsel, had given him including the article Morrison had written about Ms. Ives. Morrison made a few calls of his own resulting in an article in the Wall Street Journal January 6, 1997 in which Morrison broke the news that the White House was distributing to reporters packets of news clips detailing what it called "conspiracy theories and innuendo."

25.     In March 1998, the Washington Post quoted the CIA inspector general, Frederick Hitz, that dozens of people and companies connected to the Contra program were involved in drug trafficking. The report also said that there was an agreement in 1982, between the Attorney General and the CIA, that agency officers were not required to report allegations of drug trafficking involving non-employees, defined as paid and non-paid assets, pilots who ferried supplies to Contras, as well as Contra officials and others.

## *CROSS-FIRE*

### The following paragraph is from *CROSS-FIRE*

26.     L.D. Brown wrote his own account of these events in *Cross-fire: Witness in the Clinton Investigation*, Black Forest Press, San Diego, California 1999.
Brown became very well acquainted with Bill Clinton, being his guard and his driver. He noticed an ad in the paper for CIA employment and discussed it with

Bill Clinton who encouraged him to apply. Bill Clinton even suggested the topic of the essay he was to write, drug smuggling in Central America, and edited the essay for him. An individual at the CIA headquarters in Dallas interviewed him and told him that he would be getting a phone call from someone he needed to meet and that phone call was from Barry Seal who invited him to come to Mena. Seal invited him to take an airplane flight on a C-123 in 1984 which he did and on this flight, Hispanics threw some containers out of the plane and at the end of the flight they loaded duffel bags and flew them back to Mena. Seal showed Brown that there was cocaine in the duffel bag.

### COMPROMISED: CLINTON, BUSH AND THE CIA

The following paragraphs are from *COMPROMISED: CLINTON, BUSH AND THE CIA*

27.    Terry Reed, who trained pilots for Barry Seal in Arkansas and smuggled drugs with him, wrote a book, *Compromised: Clinton, Bush and the CIA*, Clandestine Publishing, 1995 by Terry Reed with John Cummings, which tells his history of smuggling drugs with Barry Seal. He discusses the arrangement between Seal's operation and Governor Bill Clinton's friends. He says that Seal was moving 3 million dollars per shipment and the state got 10% which fell into the hands of Governor Clinton's friends. Reed said over 109 million was laundered through an out-of-state individual's bond trading account in the name of Dennis Patrick, which was managed by Dan Lasater and his firm without Patrick's knowledge or consent. Patrick reported there were attempts on his life

involving fire bombings.   Patrick told Reed that his account showed more government securities trades than Chase Manhattan that year.

28.     Reed reported a meeting in March of 1986 which was held at a bunker in Camp Robinson located in North Little Rock, Arkansas between Bill Clinton, Clinton's aide Bob Nash, Terry Reed, Max Gomez, the alias for Felix Rodriguez, John Cathey, the alias for Oliver North, resident CIA agent Akihide Sawahata and the man in charge who called himself Robert Johnson who said he was the emissary for Mr. Casey, the head of CIA.  In this meeting, it was stated that Bob Nash was Clinton's economic head and the liaison officer with the secret intelligence operations that had been carried out undetected at the Mena airport. Johnson then described Gomez as the agency's man-in-charge of planned operations in Mexico.  Johnson said to Clinton, "The deal we made was to launder our money through your bond business but what we didn't plan on was you and your ***** ****** here start taking yourselves seriously and purposely shrinking our laundry."

29.     Johnson said Arkansas was a money launderer's heaven.  Johnson stated one must realize that intelligence agencies have the same problems that drug traffickers have, which is laundering cash and to do that a trafficker must find a bank willing to break the law by not filing documentation required for cash deposits to go offshore where reporting requirements are less strict.   Like traffickers, once offshore, the CIA must use wire transfers to get their money into the United States, but at great risk.  The substantial bond business gave the state a huge cash flow that would allow dirty and clean money to co-mingle.  All they

lacked was a dirty banker to cooperate with them by ignoring the federal banking laws.

30.     They found this within the Clinton administration.  The banker was the Arkansas Development and Finance Authority which was a creation of and directly under the control of the Governor's office.  More than $100,000 was paid by ADFA in legal fees to the Rose Law Firm.  The purpose of ADFA was to loan money to businesses in Arkansas to develop an industrial base for new jobs which Clinton had made the centerpiece of his administration.   In effect, a state investment bank was being capitalized by large cash transfusions that the CIA was taking great pains to hide.  This solved the CIA's dilemma of having the monetary resources to fund the Contras but no legal way to deliver it directly. The agency was barred by Congress with the Boland Amendment from converting the cash into weapons and training the Contras.  Johnson explained the CIA needed other companies that would be a source of secretly produced weapons which would find their way into the hands of the Contras.   Those businesses needed payment to perform these services for the CIA and that cash came to them conveniently in an illegal undetectable manner through ADFA in the form of industrial development loans.

31.     Johnson said the laundry was shrinking. Johnson knew Clinton and his people had not abided by his agreement with the agency.  "Our deal was for you to get 10% of the profits, not 10% of the gross," Johnson sternly admonished. "This has turned into a feeding frenzy by your good-ole-boy sharks and you've had a hand in it too, Mr. Clinton… Our deal with you was to launder our money.

You get 10% after costs and post-tax profits.  No one agreed for you to start loaning out money to your friends through your ADFA so that they could buy machinery to build our guns.  Mr. Sawahata tells me that one of ADFA's first customers was some parking meter company that got several million dollars in... how shall we say it...in preferred loans."

32.     Reed concluded the Clinton administration had been caught with its hand in the till and Clinton was learning personally that there were no free rides with the CIA.  Johnson was referring to the CIA's building and locating to Arkansas an existing arms manufacturing firm, Iver Johnson Arms, which had formerly been in New Jersey.  What the agency had hoped would be a very secret operation to build weapons for the Contras had been used as part of the Clinton's industrial plan and had now become an open secret among Clinton cronies.  These insiders, having learned what Iver Johnson was really doing, demanded a piece of the action for themselves and had blackmailed their way into this black operation. POM, the parking meter manufacturer, which was owned by Seth Ward who was Webb Hubbell's father-in-law, was an example of a company that had leveraged its way into the underground arms-manufacturing loop by manufacturing parts of machine guns without serial numbers so they could not be traced back to the United States government.  Webb Hubbell was an attorney with the Rose Law Firm and Webb also followed the Clintons to Washington and went to work for the Justice Department as the Associate Attorney General.

33.     This total lack of security and intelligence professionalism was apparently the reason the CIA was trying to extricate itself from Arkansas and set up

operations in Mexico.  The primary loose end that Johnson could not tie up was the investigation of Roger Clinton and his friends brought on by his drug problems.

34.    Robert Johnson said, "We are all in this together and let's not forget that the vice-president and Mr. Casey want this operation to be a success.  Mr. Seal carried with him a falsely created, high-level profile of a drug runner.  All of the cops in the country were investigating a drug operation.  They put the police into a position where we could control them.  We fed them what we wanted to feed them, when we wanted to feed them.  Seal was a diversion.  It was perfect until your brother started free enterprising and now we have to shut it down."

35.    Johnson said as far as the money investigation goes, "Mr. Meese is intervening right now and there will be no money investigation.  The United States Attorney's Office in Little Rock is 'getting religion' as we speak."  Johnson said, "Bill, you are Mr. Casey's fair-haired boy…You and your state have been our greatest asset.  Mr. Casey wanted me to pass on to you that unless you ****
up and do something stupid, you're No. 1 on the short list for a shot at the job that you've always wanted.  You and guys like you are the fathers of the new government.  We are the new covenant."

36.    Clinton and Bob Nash then left the meeting.  The CIA agent there complained about an overzealous IRS agent trying to seek indictments against their assets at Rich Mountain Aviation.  Johnson said the field agent's name was Bill Duncan and his friend was Russell Welch, an Arkansas police officer, and they were bent on exposing all of this.  No arrest ever resulted from the

investigations by Welch and Duncan.  A witness was furious he was not allowed to present the evidence to the grand jury.  The United States Attorney Michael Fitzhugh refused the jury's request to bring in Duncan to testify, telling them that Duncan was in Washington, which was not the truth.  Two FBI agents, Floyd Hayes and Tom Ross, came to Duncan to discuss Mena.  What Seal was doing wrong, said Johnson, was bribing people with dirty money because he wasn't laundering the money before using it for bribes and this led to an embarrassing paper trail that Duncan was following.  North said that one source of Seals' dirty money came from the DEA.  Asked where the money trail would lead, North said, "right to Ed Meese's personal bank account as well as several FBI, DEA, FAA and Customs officials."

**From the deposition of Richard Brenneke, taken by United States Representative William Alexander June 21, 1991 intended for the benefit of the Special Prosecutor in the Iran-Contra case:**

37.    Brenneke testified he was a private contractor for the Central Intelligence Agency from 1968 to 1986 as a pilot among other things. Beginning in 1984 he flew 10 to 12 flights of a C-130 into the Mena, Arkansas airport. He took guns and paramilitary forces from Mena to Panama. The loading and unloading at Mena would be done by workers for Rich Mountain Aviation. The cargo was unloaded in Panama by men in military uniforms into military trucks. He opened some of the containers he carried back to Mena and found they contained cocaine and in some cases marijuana. He said he carried 400-600 pounds of cocaine on each load.

38.     When Brenneke returned to Mena, the cocaine was loaded into aircraft or into hangars at Rich Mountain Aviation. Fred L. Hampton was the owner of Rich Mountain Aviation where Seal stored his plane and had his repairs done.  Other than Hampton's employees the people who received the cocaine were members of John Gotti's family in New York. One individual there was Salvatore Reale, Director of Security of Kennedy International in New York City.  It was Reale's job to see that customs procedures were avoided. Brenneke said he saw Reale and Gotti together in a club in New York City. Brenneke said the CIA began to launder money for organized crime families in New York in 1968 and 1969. He said the laundering was done in Switzerland. Brenneke said the CIA was in a partnership with Mr. Gotti and was in the business of bringing drugs into the United States. Brenneke said he asked Reale where the drugs were going and his response was New York City. Brenneke said the man who paid Hampton for his services was a full-time CIA employee named Bob Kerritt. Brenneke reported that the Gotti organization paid the CIA $50,000,000 for the drugs and Brenneke said he banked that money for them in Panama City and ultimately transferred it to Europe.  The money was given to Brenneke in cash and he deposited it in the Banqua DePanama in an account in the name of IFMA, a company organized by Brenneke. The money was given to Brenneke by an agent of the Gotti organization and the money went to the CIA.  See this site for more details: http://www.nytimes.com/1988/02/05/nyregion/crime-figure-given-exile-not-prison.html.

39.     Brenneke said he discussed the drug smuggling with Don Gregg, Vice President George Bush's National Security Advisor and Gregg told Brenneke it was not his business what he was flying in and out of the country and told Brenneke to shut up and do his job.

40.     Brenneke said he was concerned over bringing drugs in. Brenneke said he was recruited by the CIA for the purpose of laundering money. Brenneke said he used Banqua DeMexico, Credit Suisse and Bank of Credit and Commerce, commonly referred to as BCCI. He said he organized a bank in Panama used by CIA and organized crime families called US Investment Bank. He used bearer bonds to transfer money.

41.     Brenneke said he discussed his concerns with Bill Casey, the director of the CIA.  Brenneke said the Gotti money was also used to fund the operations at Nella, Arkansas where the flight instruction for Nicaraguan pilots was done. He said one of the flight instructors there was Terry Reed.  Brenneke said he testified for Reed at his trial in Kansas. Brenneke said he established an account at Brown Brothers Harriman in New York City to get the money back into the United States.

42.     In conclusion, if the books and the statements in the deposition are true, it is clear that the suppression of the investigation and these reports requested was ordered at the highest levels of government to conceal crimes by individuals and government officials and these reports will not be forthcoming without federal court orders, if then.  The smuggling of guns was deemed necessary because the government headed by Ronald Reagan and Vice President Bush wanted a regime

change in Nicaragua.  Some or all of those involved in the smuggling of guns
smuggled tons of cocaine into the United States. When this cocaine was placed in
the stream of commerce, people were prosecuted, courthouses and prisons had to
be built and lives were lost.  The government officials who came up with this
arrangement to smuggle millions of dollars worth of cocaine should have known
that lives would be lost.  Kevin Ives was one of those lives.

**FOIA REQUESTS AND RESPONSES**

**FEDERAL AGENCIES**

**CENTRAL INTELLIGENCE AGENCY**

43.    Undersigned counsel sent an initial FOIA request to the CIA dated April
9, 2012, attached hereto as **Exhibit 1.**  The CIA responded on May 23, 2012,
attached hereto as **Exhibit 2,** requesting Kevin Ives' full name, date and place of
birth, citizenship status and proof of death.  Undersigned counsel responded in a
letter dated June 4, 2012, attached hereto as **Exhibit 3.**  In a letter dated August
21, 2012 which is attached hereto as **Exhibit 4,** the CIA stated it did not find any
records responsive to counsel's request.  That letter further states, "With respect
to records that would reveal a classified connection between the CIA and your
subject, in accordance with section 3.6 (a) of Executive Order 13526,
https://www.whitehouse.gov/the-press-office/executive-order-classified-national-
security-information,  the CIA can neither confirm nor deny the existence or
nonexistence of records responsive to your request. The fact of the existence or
nonexistence of requested records is currently and properly classified and relates
to intelligence sources and methods information that is protected from disclosure

by section 6 of the CIA Act of 1949,

https://www.dni.gov/index.php/about/organization/ic-legal-reference-book-2012/ref-book-central-intelligence-agency-act-of-1949, as amended, and section

102A (i) (l) of the National Security Act of 1947,

http://legcounsel.house.gov/Comps/National%20Security%20Act%20Of%201947.pdf, as amended." The letter went on to state that this portion of undersigned

counsel's request was denied pursuant to FOI exemptions b (1) and b (3). The

response from the CIA seems to lend credence to the idea that there is a cover-up.

In a letter dated January 10, 2013 undersigned counsel responded to the CIA,

attached hereto as **Exhibit 5.**

## FEDERAL BUREAU OF INVESTIGATION

44.     Undersigned counsel's initial FOIA request to the FBI dated April 20,

2012 is attached hereto as **Exhibit 6** which asks for unredacted copies as Mrs.

Ives already has redacted copies. . On May 2, 2012, the FBI responded

acknowledging receipt of undersigned counsel's FOI request, attached hereto as

**Exhibit 7.** The FBI responded in a letter dated August 14, 2012, attached hereto

as **Exhibit 8,** in which the FBI states that they have located approximately 7,427

pages of documents, 12 cassette tapes and 5 VHS tapes which are potentially

responsive to our request. In a letter dated August 27, 2012, attached hereto as

**Exhibit 9,** undersigned counsel agrees to pay the estimated costs to obtain the

documents and other items located by the FBI. On December 5, 2012,

undersigned counsel wrote a letter addressed to David Hardy of the FBI, attached

hereto as **Exhibit 10,** stating that undersigned counsel would be responsible for

the payment for copies of the documents located responsive to undersigned

counsel's FOI request and further stating that undersigned counsel had not

received said documents.  On December 6, 2012, the FBI responded, attached

hereto as **Exhibit 11**, stating again that they found approximately 7,167 pages of

documents responsive to undersigned counsel's request and requesting a

commitment to pay the estimated amount and the format choice.  On December

12, 2012, undersigned counsel responded to the FBI, attached hereto as **Exhibit

12**, stating undersigned counsel's commitment to pay the estimated fee for the

information the FBI had identified as responsive to undersigned counsel's FOI

request and the format choice.  On December 18, 2012, the FBI wrote a letter,

attached hereto as **Exhibit 13**, that stated that undersigned counsel, Mr. Lewis,

spoke with Mr. Hardy's representative, Mr. Mumaw, and was advised by Mr.

Mumaw that undersigned counsel's FOI request # 1189116-001 on subject Kevin

Ives was currently in the large-track of the multi-track backlog of unassigned

FOIA requests, finding approximately 7,427 pages, and that these requests are

typically delayed for a significant amount of time. On December 19, 2012, the

FBI wrote a letter, attached hereto as **Exhibit 14**, that stated that undersigned

counsel, Mr. Lewis, spoke with Mr. Hardy's representative, Mr. Mumaw, and was

advised by Mr. Mumaw that undersigned counsel's FOI request # 1189120-000

on subject Barry Seal was currently in the large-track of the multi-track backlog

of unassigned FOIA requests, finding approximately 7,167 pages, and that these

requests are typically delayed for a significant amount of time.  In a letter dated

February 19, 2013, attached hereto as **Exhibit 15**, the FBI reviewed 726 pages

and released 448 pages on FOI request # 1189120 on subject Barry Seal.

Undersigned counsel wrote a letter to the FBI on February 26, 2013, attached

hereto as **Exhibit 16**, which stated that information had been received on Barry

Seal but no information had been received pursuant to FOI request #1189116-000

and #1189116-001 involving subject Kevin Ives.  On April 30, 2013, the FBI

wrote a letter to undersigned counsel, attached hereto as **Exhibit 17**, stating that

they had reviewed 612 pages and were releasing 307 pages pursuant to FOI

request #1189116-001 on subject Kevin Ives. On May 16, 2013, the FBI wrote a

letter to undersigned counsel, attached hereto as **Exhibit 18**, stating that they had

reviewed 687 pages and were releasing 415 pages pursuant to FOI request

#1189116-001 on subject Kevin Ives.  On July 15, 2013, undersigned counsel

wrote a letter to the FBI, attached hereto as **Exhibit 19**, requesting an

administrative appeal to release the information unredacted due to the age of the

case and on the grounds the denials are extremely broad and unconstitutional. On

August 6, 2013, the FBI wrote a letter to undersigned counsel, attached hereto as

**Exhibit 20**, stating that they had reviewed 931 pages and were releasing 725

pages pursuant to FOI request #1189120-000 on subject Barry Seal.  In a letter

dated August 21, 2013 which is attached hereto as **Exhibit 21**, Sean O'Neill,

Chief Administrative Appeals Staff from the U.S. Department of Justice, Office

of Information Policy responded denying undersigned counsel's request for an

administrative appeal due to receiving the request 11 days too late.  In a letter

dated September 30, 2013 which is attached hereto as **Exhibit 22**, the U.S.

Department of Justice, Drug Enforcement Administration, FOI/Records

Management Section responded via Katherine Myrick, Chief, Freedom of

Information/Privacy Act Unit of the FOI/Records Management Section stating

that the FBI had referred undersigned counsel's FOIA request dated April 20,

2012 to the DEA and the DEA after reviewing 20 pages of documents had

determined to release 20 pages of documents. In a letter dated October 30, 2013

which is attached hereto as **Exhibit 23,** undersigned counsel responded to the

FBI's letter dated September 30, 2013 and requested an administrative appeal of

case number 13-00008-FRC, FBI #1189120-000. In a letter dated November 13,

2013 which is attached hereto as **Exhibit 24,** the U.S. Department of Justice,

Office of Information Policy, Priscilla Jones, Supervisory Administrative

Specialist responded to undersigned counsel and advised receipt of undersigned

counsel's request for an administrative appeal and assigned number AP-2014-

00425 pursuant to request number 1189120.. In a letter dated January 7, 2014

which is attached hereto as **Exhibit 25,** the U.S. Department of Justice, Office of

Information Policy responded via Sean O'Neill, Chief, Administrative Appeals

Staff by Anne D. Work, Senior Counsel, Administrative Appeals Staff and stated

that undersigned counsel's appeal number AP-2014-00425, Request #1189120,

ADW: RRK was received too late since the FBI had responded to undersigned

counsel on August 6, 2013 and the FBI received undersigned counsel's response

on November 6, 2013 which was 32 days late. However, undersigned counsel

was responding to a letter dated September 30, 2013 and was received on

November 6, 2013 which was well within the sixty days allowed. In a letter dated

January 14, 2014 which is attached hereto as **Exhibit 26,** undersigned counsel

responded and disputed that the request for an appeal was untimely. In a letter dated February 3, 2014 which is attached hereto as **Exhibit 27,** the U.S. Department of Justice, Office of Information Policy responds and states that the September 30, 2013 letter from DEA was in response to request no 13-00008 (FBI #118116-001) and appeal number AP-2013-05137 which was closed on November 26, 2013 and that appeal number AP-2014-00425 pertained to request number 13-00006 (FBI #1189120-000) which DEA responded to on August 6, 2013 and undersigned counsel's letter attempting to appeal was postmarked October 31, 2013, more than thirty days after the regulatory deadline and appeal number AP-2014-00425 was closed on December 23, 2013.

## DEPARTMENT OF JUSTICE

45.     On April 20, 2012, undersigned counsel sent the initial FOIA request to the Department of Justice, Rena Kim, attached hereto as **Exhibit 28,** requesting records pertaining to the death of Kevin Ives, which occurred on August 23, 1987, and any information relevant to the Mena airport and drug trafficking. In a letter dated May 17, 2012 which is attached hereto as **Exhibit 29**, the DOJ responded acknowledging receipt of undersigned counsel's request, assigning file number CRM-201200334P and requesting more information about Kevin Ives. In a letter dated June 4, 2012 which is attached hereto as **Exhibit 30**, undersigned counsel responded to the DOJ stating that Larry Kevin Ives was a U.S. citizen prior to his death and included his death certificate with the letter sent. In a letter dated September 7, 2012 which is attached hereto as **Exhibit 31**, the DOJ responded denying undersigned counsel's request for a fee waiver. In a letter dated

September 14, 2012 which is attached hereto as **Exhibit 32**, the DOJ again acknowledged receipt of undersigned counsel's FOIA request dated April 20, 2012 and assigned another file number, CRM-201200672P.  In a letter dated November 13, 2012 which is attached hereto as **Exhibit 33**, the DOJ responded stating that thorough searches had been performed and no records responsive had been discovered.  In a letter dated December 5, 2012 which is attached hereto as **Exhibit 34**, undersigned counsel requested that the DOJ inform if any records responsive to undersigned counsel's request for information pertaining to Larry Kevin Ives had been located.  In a letter dated December 10, 2012 which is attached hereto as **Exhibit 35**, the DOJ responded stating that no records had been located pertaining to Larry Kevin Ives or Barry Seal and drug trafficking at the Mena airport.  In a letter dated June 26, 2013 which is attached hereto as **Exhibit 36**, the U.S. Department of Justice, Criminal Division responded and stated that while processing undersigned counsel's FOIA request dated April 20, 2012 the FBI identified four pages and referred those to the Criminal Division for processing and assigned the number CRM-201300134F/PR1:GIS2.  In a letter dated August 29, 2013 which is attached hereto as **Exhibit 37**, undersigned counsel clarifies in response to a letter dated 6/26/13 from Kenneth Courter, Acting Chief-FOIA/PA Unit, U.S. Department of Justice, the information being sought in their FOIA request to include information relating to Barry Seal and Larry Kevin Ives.  In a letter dated October 31, 2013 which is attached hereto as **Exhibit 38**, the U.S. Department of Justice, Office of Information Policy responds and acknowledges receipt of undersigned counsel's appeal dated September 26,

2013 [sic] and assigns request number 2013-2797-R and appeal number AP-2014-
00232 and further states that due to the government shut-down from 10/1-10/16 of
2013 undersigned counsel's letter was not opened until October 17, 2013.  In a
letter dated February 25, 2014 which is attached hereto as **Exhibit 39,** the U.S.
Department of Justice, Office of Information Policy responds and states that after
considering undersigned counsel's appeal, AP-2014-00232, request number 2013-
2797-R they are affirming on partly modified grounds and continuing to withhold
the information previously withheld.

### DRUG ENFORCEMENT ADMINISTRATION

46.      In a letter dated April 20, 2012 which was faxed on December 5, 2012 to
Katherine Myrick, Chief, Freedom of Information Operations Unit, FOI/Records,
DEA which is attached hereto as **Exhibit 40,** undersigned counsel formally
requested information regarding Kevin Ives and any documentation relating to
drug trafficking at the Mena airport and Barry Seal.  In a letter dated December
11, 2012 which is attached hereto as **Exhibit 41,** DEA responded via Katherine
Myrick stating that they were in receipt of the FOIA request, assigned case
number 13-00114-F and requested proof of death.  In a letter dated December 24,
2012 which is attached hereto as **Exhibit 42,** undersigned counsel responded and
enclosed a death certificate for Larry Kevin Ives.  On January 9, 2013 which is
attached hereto as **Exhibit 43,** a fax was sent to Katherine Myrick which attached
the December 24, 2012 letter as it had come back undelivered.  In a letter dated
January 14, 2013 which is attached hereto as **Exhibit 44,** the DEA responds via
Katherine Myrick and states that no information was recovered relating to Larry

Kevin Ives and without proof of death of Barry Seal or an original notarized authorization no further action would be taken.  Adler Berriman "Barry" Seal was born July 16, 1939 and was murdered February 19, 1986 in Baton Rouge, Louisiana which the DEA was well aware of since they were conducting an investigation into drug smuggling and money laundering at the time of Seal's murder and Seal was working as a DEA informant/operative as part of his plea bargain.  In a letter dated May 28, 2013 which is attached hereto as **Exhibit 45**, the DEA responds via Katherine Myrick and states that this letter acknowledges receipt of documents forwarded to the DEA by the FBI regarding subject Kevin Ives (FBI 1189116-001) and assigned this request case number 13-00006-FRC. In a letter dated July 1, 2013 which is attached hereto as **Exhibit 46**, the DEA responds via Katherine Myrick, (FBI 1189116-001) case number 13-00006-FRC, stating that they have reviewed the five pages forwarded to the DEA by the FBI and have denied undersigned counsel's request to release the information.  In a letter dated August 26, 2013 which is attached hereto as **Exhibit 47**, undersigned counsel requested an administrative appeal relating to the DEA's letter dated July 1, 2013.  In a letter dated August 29, 2013 which is attached hereto as **Exhibit 48**, the DEA via Katherine Myrick acknowledged the receipt of documents forwarded to the DEA from the FBI (FBI#1189120-000) in response to undersigned counsel's FOIA dated August 5, 2013 and assigned case number 13-00008-FRC. In a letter dated September 12, 2013 which is attached hereto as **Exhibit 49**, the Department of Justice via Priscilla Jones, Supervisory Administrative Specialist responded stating that they had received undersigned counsel's administrative

appeal (Request No. 13-00006-FRC) on September 3, 2013 and assigned number AP-2013-05137.  In a letter dated September 30, 2013 which is attached hereto as **Exhibit 50,** the DEA responded via Katherine Myrick and stated that they had completed their review of 20 pages of documents forwarded to them by the FBI (FBI#1189120-000) pursuant to undersigned counsel's FOIA request dated April 20, 2012, released all 20 pages of documents heavily redacted and assigned case number 13-00008-FRC.  In a letter dated October 30, 2013 which is attached hereto as **Exhibit 51,** undersigned counsel requests an administrative appeal regarding case number 13-00008-FRC, FBI #1189120-000.

## DEFENSE INTELLIGENCE AGENCY

47.     In a letter dated September 28, 2013 which is attached hereto as **Exhibit 52,** the Defense Intelligence Agency responds to undersigned counsel's FOIA request dated April 20, 2012 in which the FBI forwarded some documents that originated with the DIA, stated that they were withholding 9 pages and assigned the number U-13-2342/FAC2A1 (FOIA).

## UNITED STATES DEPARTMENT OF STATE

48.     In a letter dated September 20, 2013 which is attached hereto as **Exhibit 53,** the U.S. Department of State responded to undersigned counsel's FOIA request dated April 20, 2012 due to the FBI referring documents to the U.S. Department of State for review and stated that redactions had been made and one document was withheld and assigned case number F-2013-03734, segment FBI-0001.

## UNITED STATES DEPARTMENT OF HOMELAND SECURITY

49.     In a letter dated April 20, 2012 which is attached hereto as **Exhibit 54**,
undersigned counsel formally requested information under the Freedom of
Information Act relating to Kevin Ives, drug trafficking at the Mena airport and
Barry Seal.  In a letter dated May 4, 2012 which is attached hereto as **Exhibit 55**,
the Department of Homeland Security (DHS/OS/PRIV 12-0415) acknowledges
the receipt of undersigned counsel's FOIA request on April 30, 2012 and stated
that an adequate search could not be conducted as DHS had been created in 2003
and no records existed prior to that and requesting additional information to
perform a search.  In a letter dated June 4, 2012 which is attached hereto as
**Exhibit 56**, undersigned counsel provided a copy of Larry Kevin Ives' death
certificate and some of the redacted copies provided by other agencies.  In a letter
dated July 12, 2012 which is attached hereto as **Exhibit 57**, the Department of
Homeland Security, U.S. Immigration and Customs Enforcement responded and
acknowledged receipt of undersigned counsel's FOIA request (2012FOIA16690)
dated June 29, 2012 on July 12, 2012.  In a letter dated July 26, 2012 which is
attached hereto as **Exhibit 58**, the Department of Homeland Security, U.S.
Immigration and Customs Enforcement responded stating that no records
responsive to counsel's FOIA request had been located regarding Larry Kelvin
Ives.  In a letter dated August 8, 2012 which is attached hereto as **Exhibit 59**,
undersigned counsel requested that a review of information be conducted for
Larry Kevin Ives and not Larry Kelvin Ives.

## UNITED STATES ATTORNEY'S OFFICE

50.     In a letter dated April 9, 2012 sent via fax (501) 340-2730 which is
attached hereto as **Exhibit 60**, undersigned counsel formally requested an FOIA
request for information pertaining to Kevin Ives, Barry Seal and any information
associated with drug trafficking at the Mena airport.  In a letter dated April 9,
2012 which is attached hereto as **Exhibit 61**, the U.S Attorney's Office responded
acknowledging receipt of undersigned counsel's FOIA request dated April 9,
2012 and further stating that the letter was forwarded to the Freedom of
Information Act Unit, Executive Office for the United States Attorney's in
Washington, D.C.  In a letter dated May 2, 2012 which is attached hereto as
**Exhibit 62**, the U.S. Department of Justice, Executive Office for the United States
Attorney's acknowledged receipt of undersigned counsel's FOIA request and
assigned number 2001-1388.  In a letter dated June 4, 2012 which is attached
hereto as **Exhibit 63**, undersigned counsel responded with information specifying
subject matter sought and included Larry Kevin Ives' death certificate.  In a letter
dated July 16, 2012 which is attached hereto as **Exhibit 64**, the U.S. Department
of Justice, Executive Office for the United States Attorney's responded and
advised that they had received undersigned counsel's FOIA request and assigned
the request no. 12-2687.  In a letter dated September 12, 2012, attached hereto as
**Exhibit 65,** the U.S. Department of Justice, Executive Office for the United States
Attorney's responded and states that a search for records in the District of Indiana
yielded no records responsive to undersigned counsel's request.  In a letter dated
December 5, 2012 sent via fax (202) 252-6047 which is attached hereto as

**Exhibit 66**, undersigned counsel requests that a search be performed for the information requested in the District of Arkansas and not the District of Indiana. In a letter dated January 10, 2013 which is attached hereto as **Exhibit 67**, undersigned counsel requests a search be performed for the information requested in the State of Arkansas pertaining to the death of Larry Kevin Ives deceased 8/23/87. In a letter dated January 10, 2013 which is attached hereto as **Exhibit 68**, undersigned counsel encloses a letter from 6/11/12 pursuant to FOIA request number 12-2687 and requests that the U.S. Attorney's Office do a search for information relevant to the death of Larry Kevin Ives be done in the Eastern and Western District of Arkansas. In a letter dated January 10, 2013 which is attached hereto as **Exhibit 69**, undersigned counsel requested a response on the FOIA request. In a letter dated January 17, 2013 which is attached hereto as **Exhibit 70**, the U.S. Department of Justice, Executive Office for United States Attorneys responded stating that they had received undersigned counsel's FOIA request and assigned request no. 12-5235. In a letter dated February 25, 2013 which is attached hereto as **Exhibit 71**, the U.S. Department of Justice, Executive Office for United States Attorneys responded stating that undersigned counsel had been assigned two FOIA numbers, 12-2687 and 12-5235, and that a response had been sent which incorrectly identified a search done in the District of Indiana when in fact the search was done in the District of Arkansas and stating no records responsive to undersigned counsel's request had been located and both cases were being closed.

## STATE AGENCIES

## ARKANSAS STATE POLICE

51.     In a letter dated April 9, 2012 which is attached hereto as **Exhibit 72**,

undersigned counsel formally requested unredacted information regarding Kevin

Ives, Barry Seal and any drug trafficking at the Mena, Arkansas airport.  In a

letter dated May 29, 2012 which is attached hereto as **Exhibit 73**, undersigned

counsel again requested unredacted information be provided regarding Kevin

Ives, Barry Seal, Danny Harmon, Kirk Lane, Jay Campbell and any drug

trafficking at the Mena Airport.  In an email dated May 29, 2012 which is

attached hereto as **Exhibit 74**, Bill Sadler responded for ASP and stated that

undersigned counsel's request had been sent to the Criminal Investigation

Division to determine what records exist    In a letter dated February 26, 2013

which is attached hereto as **Exhibit 75**, undersigned counsel references a previous

letter dated May 29, 2013 [sic], the date should have read May 29, 2012, and asks

when undersigned counsel might expect an answer to counsel's FOIA request

dated April 9, 2012.  In a letter dated August 29, 2013 which is attached hereto as

**Exhibit 76**, undersigned counsel again writes ASP and requests an answer to

undersigned counsel's FOIA and states that according to Bill Sadler, this matter

was forwarded to the Criminal Investigation Division and that undersigned

counsel has yet to receive a response.  Undersigned counsel has still not received

a response.  Plaintiff has received investigative reports from the Arkansas State

Police from the spring of 1988-1991.

## BRYANT POLICE DEPARTMENT

52.     In a letter dated April 9, 2012, attached hereto as **Exhibit 77,** undersigned

counsel advises Bryant Police Department that he represents Linda Ives and is

requesting through FOIA all unredacted records, recordings, documents, emails

regarding the death of Kevin Ives on August 23, 1987, Barry Seal and drug

trafficking at the Mena, Arkansas airport.  In a letter dated April 10, 2012,

attached hereto as **Exhibit 78,** Bryant Police Department responds and states that

they do not have any records relevant to the death of Kevin Ives which occurred

on August 23, 1987 and advises that an incident took place on Shobe Road

involving Bryant Police Officer, Danny Allen, where Allen was shot at by an

unknown assailant on Shobe Road on August 17, 1987 and enclosed the incident

report.  Bryant Police Department further stated that they did not have any

information or records regarding Barry Seal or Mena Airport drug trafficking.

## SALINE COUNTY SHERIFF'S OFFICE

53.     In a letter dated May 2, 2012 which is attached hereto as **Exhibit 79,** the

Saline County Sheriff's Office responded to undersigned counsel's FOIA request

dated May 2, 2012 regarding information about the death of Kevin Ives and stated

that it was still an open murder investigation and no files could be released other

than the incident report.

54.     A sample of redacted records furnished by the FBI is attached hereto as

**Exhibit 80,** showing that the redactions were so severe as to render the documents

worthless.  All documents produced by all agencies have similar redactions.

WHEREFORE, plaintiff prays for the Court to order the defendant agencies to respond to this Freedom of Information Request with completely unredacted documents, for attorney's fees, costs, and all other proper relief to which she may be entitled against any agencies who are directly or indirectly responsible for the death of Larry Kevin Ives or have covered up who was responsible for the death of Larry Kevin Ives.

Respectfully Submitted:

R. David Lewis ABN 68030
Attorney for plaintiff
1109 Kavanaugh Blvd.
Little Rock, AR 72205
(501) 664-0818
(501) 664-3884 fax